**ROCHE FREEDMAN LLP**
Ivy T. Ngo (249860)
Constantine P. Economides (*pro hac vice* forthcoming)
Velvel (Devin) Freedman (*pro hac vice* forthcoming)
1 SE 3rd Avenue
Suite 1240
Miami, Florida 33131
T: (305) 971-5943
ingo@rochefreedman.com
ceconomides@rochefreedman.com
vel@rochefreedman.com

*Counsel for Sweta Sonthalia and Proposed Lead Counsel*

**LABATON SUCHAROW LLP**
David J. Schwartz (*pro hac vice* forthcoming)
140 Broadway
New York, New York 10005
T: (212) 907-0870
F: (212) 883-7070
dschwartz@labaton.com

*Additional Counsel for Sweta Sonthalia*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ASIF MEHEDI, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>VIEW, INC. f/k/a CF FINANCE ACQUISITION CORP. II, RAO MULPURI, and VIDUL PRAKASH,<br><br>Defendants. | No. 5:21-cv-06374-BLF<br><br>**NOTICE OF MOTION AND MOTION OF SWETA SONTHALIA FOR LEAVE OF COURT TO FILE MOTION FOR RECONSIDERATION OF ORDER APPOINTING LEAD PLAINTIFF AND APPROVING SELECTION OF COUNSEL (ECF NO. 67); MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**<br><br>Hon. Beth Labson Freeman<br>Courtroom 3 – 5th Floor (San Jose) |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... ii

NOTICE OF MOTION ............................................................................................................ 1

SUMMARY OF ARGUMENT ................................................................................................ 1

MEMORANDUM OF POINTS AND AUTHORITIES ........................................................... 5

I.   LEAVE TO FILE A MOTION FOR RECONSIDERATION IS WARRANTED ............... 5

   A.   The Court's methodology erroneously rejected the movants' purchase price. ............... 6

   B.   The Court's interpretation of *Dura* conflates loss causation with transaction causation, making an improper finding of fact at the lead plaintiff stage. ..................... 9

   C.   Pursuant to the PSLRA and *Dura,* Sonthalia has the largest financial interest............. 13

II.  CONCLUSION.................................................................................................................... 14

NOTICE OF MOTION AND MOTION OF SWETA SONTHALIA FOR LEAVE OF COURT TO FILE MOTION FOR RECONSIDERATION OF ORDER APPOINTING LEAD PLAINTIFF AND APPROVING SELECTION OF COUNSEL (DKT. NO. 67); MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT | CASE NO. 5:21-cv-06374-BLF

## TABLE OF AUTHORITIES

**Cases**

*Acticon AG v. China North East Petroleum Holdings Ltd.*,
   692 F.3d 34 (2d Cir. 2012)...................................................................... 2, 7

*Applestein v. Medivation Inc.,*
   2010 WL 3749406 (N.D. Cal. Sept. 20, 2010)............................................ 4, 7

*Basic, Inc. v. Levinson*,
   485 U.S. 224 (1988) ...................................................................... 3, 10

*Berson v. Applied Signal Tech., Inc.*,
   527 F.3d 982 (9th Cir. 2008)................................................................ 12

*Broudo v. Dura Pharms., Inc.*,
   339 F.3d 933 (9th Cir. 2003), *rev'd*, 544 U.S. 336 (2005)................................ 11

*Cook v. Allergan PLC*,
   2019 WL 1510894 (S.D.N.Y. Mar. 21, 2019) ................................................ 12

*Courter v. Cytodyn, Inc.*,
   2021 WL 4989446 (W.D. Wash. Oct. 27, 2021) ............................................... 3

*Dura Pharms. v. Broudo*,
   544 US. 336 (2005) .................................................................. passim

*Eichenholtz v. Verifone Holdings, Inc.*,
   2008 WL 3925289 (N.D. Cal. Aug. 22, 2008)................................................ 3, 7

*Erica P. John Fund, Inc. v. Halliburton Co.*,
   563 U.S. 804 (2011) ................................................................... 3, 9, 10

*Fialkov v. Celladon Corp.*,
   2015 WL 11658717 (S.D. Cal. Dec. 9, 2015)................................................... 4

*FindWhat Investor Group v. FindWhat.com*,
   658 F.3d 1282 (11th Cir. 2011 ........................................................... 3, 10

*Glickenhaus & Co. v. Household Intern., Inc.*,
   787 F.3d 408 (7th Cir. 2015)............................................................... 10

*Gutman v. Sillerman*,
   2015 WL 13791788 (S.D.N.Y. Dec. 8, 2015).................................................. 6

*Halliburton Co. v. Erica P. John Fund, Inc.*,
   134 S. Ct. 2398 (2014) .................................................................... 11

ii

*In re Allstate Corp. Sec. Litig.*,
966 F.3d. 595 (2020) ........................................................................................ 8, 10, 11

*In re Bofi Holding, Inc. Sec. Litig,*
977 F.3d 781 (9th Cir. 2020) ....................................................................................... 3, 11

*In re Cavanaugh*,
306 F.3d 726 (9th Cir. 2002) .............................................................................................. 6

*In re Cohen*,
586 F.3d 703 (9th Cir. 2009) .............................................................................................. 6

*In re Daou Systems, Inc.*,
411 F.3d 1006 (9th Cir. 2005) ......................................................................................... 11

*In re Fastly, Inc. Sec. Litig.*,
2021 WL 493386 (N.D. Cal. Feb. 10, 2021) ..................................................................... 4

*In re Gilead Scis. Sec. Litig.*,
536 F.3d 1049 (9th Cir. 2008) ..................................................................................... 4, 12

*In re Lyft Sec. Litig.*,
2020 WL 1043628 (N.D. Cal. Mar. 4, 2020) ..................................................................... 3

*In re Royal Dutch/Shell Transp. Sec. Litig.*,
404 F. Supp. 2d 605 (D.N.J. 2005) ................................................................................... 2

*In re Watchguard Sec. Litig.*,
2005 U.S. Dist. LEXIS 40923 (D. Wash. July 13, 2005) ............................................... 12

*In re Wrap Techs., Inc. Sec. Exch. Act Litig.*,
2021 WL 71433 (C.D. Cal. Jan. 7, 2021) .......................................................................... 6

*Irving Firemens Relief and Ret. Fund v. Uber Techs. Inc.*,
998 F.3d 397 (9th Cir. 2021) ........................................................................................... 11

*Lewis v. CytoDyn, Inc.*,
2021 WL 3709291 (W.D. Wash. Aug. 19, 2021) ............................................................... 3

*Loftus v. Primero Mining Corp.*,
2016 WL 11741138 (C.D. Cal. May 12, 2016) .................................................................. 4

*McCabe v. Ernst & Young, LLP*,
494 F.3d 418 (3d Cir. 2007) ............................................................................................. 11

*Mulligan v. Impax Lab'ys, Inc.*,
2013 WL 3354420 (N.D. Cal. July 2, 2013) ................................................................... 4, 7

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*,
  730 F.3d 1111 (9th Cir. 2013) ........................................................................................... 3

*Rihn v. Acadia Pharms. Inc.*,
  2015 WL 5227923 (S.D. Cal. Sept. 8, 2015) ..................................................................... 4

*Ruland v. Infosonics Corp.*,
  2006 WL 3746716 (S.D. Cal. Oct. 23, 2006) .................................................................... 4

*Saint Jermain v. Fluidigm Corp.*,
  2020 WL 7342717 (N.D. Cal. Dec. 14, 2020) .................................................................... 4

*Sallustro v. CannaVest Corp.*,
  93 F. Supp. 3d 265 (S.D.N.Y. 2015) ............................................................................... 5, 6

*Scheller v. Nutanix*,
  2021 WL 2410832 (N.D. Cal. June 10, 2021) ................................................................... 3

*School Dist. No. 1J Multnomah Cty., Or. v. ACandS, Inc.*,
  5 F.3d 1255 (9th Cir. 1993) ............................................................................................ 5, 6

*Schueneman v. Arena Pharm., Inc.*,
  2011 WL 3475380 (S.D. Cal. Aug. 8, 2011) ............................................................... 4, 7, 8

*Simco v. Aegean Marine Petroleum Network Inc.*,
  2018 WL 11226076 (S.D.N.Y. Oct. 30, 2018) ................................................................... 6

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) .......................................................................................................... 4

*Xu v. FibroGen, Inc.*,
  2021 WL 3861454 (N.D. Cal. Aug. 30, 2021) ................................................................... 3

**Other Authorities**

15 U.S.C. § 78c ...................................................................................................................... 7

15 U.S.C. § 78u .............................................................................................................. passim

S. Rep. No. 104–98 (1995), reprinted in 1995 U.S.C.C.A.N. 679) .................................... 7

iv

TO:    ALL PARTIES AND THEIR COUNSEL OF RECORD

PLEASE TAKE NOTICE that Sweta Sonthalia will and hereby does respectfully move this Court pursuant to Civil L.R. 7-9(a) for leave to file a motion for reconsideration of its February 8, 2022 Order, appointing Stadium Capital as Lead Plaintiff and approving its selection of Kaplan Fox & Kilsheimer LLP ("Kaplan Fox") as Lead Counsel (the "Lead Plaintiff Order") (ECF No. 67).[1]

**SUMMARY OF ARGUMENT**

Civil L.R. 7-9(b)(3) permits a party to move for reconsideration of an interlocutory order when, *inter alia*, a court has "fail[ed] . . . to consider material facts or dispositive legal arguments which were presented to the Court." Here, Sonthalia respectfully submits that in determining the movants' "financial interest" within the meaning of the PSLRA, the Court (1) applied a method that renders purchase price irrelevant, inconsistent with the statute's cap on damages (15 U.S.C. § 78u-4(e)) and the Supreme Court's holding in *Dura Pharms. v. Broudo*, 544 U.S. 336 (2005), and (2) improperly made a finding of fact relating to loss causation to support the Court's methodology.

The PSLRA expressly provides a formula for class members, like Sonthalia, who continue to hold their retained shares for more than 90 days after a corrective disclosure. Such class members continue to incur losses if the company's stock price continues to decline after the truth is revealed, but the PSLRA limits their damages to "the difference between the **purchase or sale price paid or received**…and the mean trading price of that security during the 90-day period" after the corrective disclosure (*i.e.*, the "lookback" period). 15 U.S.C. § 78u-4(e)(1). Similarly, for class members who, like Stadium Capital, sold their retained shares before the end of the lookback period, the PSLRA limits their damages to "the difference between the **purchase or sale price paid or received**…and the mean trading price of the security during the period beginning immediately after dissemination of information correcting the misstatement or omission and ending when the plaintiff sells or

---

[1] Unless otherwise noted, capitalized terms have the meanings ascribed in Sonthalia's Lead Plaintiff Motion and subsequent briefing (*see* ECF Nos. 27, 47-48); ¶ references are to the Complaint (ECF No. 1); emphasis is added; and internal citations are omitted.

repurchases the security." *Id.* § 78u-4(e)(2). As such, the only two calculations set forth in the PSLRA use the "**purchase … price paid**" (or the "**sale price … received**" where stock is acquired *via* options) as the starting point to calculate damages, and the lookback price as a cap for damages.

In contrast to these statutorily described calculations, the Court's methodology failed to utilize the actual purchase price paid by the movants as the starting point. Under the Court's method, the market price of View stock "just prior to disclosure," was substituted for "purchase price paid." Thus, the actual price paid by the movants *has no relevance at all* to the "financial interest" determined by the Court, with all pre-disclosure loss in value irrefutably presumed to be the result of "market forces" rather than the defendants' alleged fraud. As several courts have recognized, this method is inconsistent with the statute and *Dura* and may lead to unfair and even absurd results.

The purpose of the PSLRA's damages cap is to limit the recovery of a plaintiff who seeks to establish damages by reference to the market price of a security following a corrective disclosure. The statute's legislative history confirms that Congress was concerned that "'calculating damages based on the date corrective information is disclosed may substantially overestimate plaintiff's actual damages.'" *Acticon AG v. China North East Petroleum Holdings Ltd*., 692 F.3d 34, 39 (2d Cir. 2012) (quoting S.Rep. No. 104-98, at 20 (1995), reprinted in 1995 U.S.C.C.A.N. 679, 699). "In essence, [the PSLRA's damages cap] 'does not calculate damages based on the single day decline in price, but instead allows the security an opportunity to recover' over a period of 90 days." *Id.* In other words, the 90-day lookback provision was created to set a definitive ending point – a cap – for calculating loss following a corrective disclosure. Aside from imposing this cap, "Congress did not otherwise disturb the traditional out-of-pocket method for calculating damages in the PSLRA." *Id.*; *see also In re Royal Dutch/Shell Transp. Sec. Litig.*, 404 F. Supp. 2d 605, 609-610 (D.N.J. 2005). Under the "out-of-pocket" method, "a defrauded buyer of securities is entitled to recover only the excess of what he paid over the value of what he got. In other words, damages consist of the difference between the price paid and the 'value' of the stock when bought." *Id.*

A decade later, the Supreme Court in *Dura* ruled that to sustain a claim under § 10(b) and Rule 10b-5, a plaintiff must show that a public revelation of the alleged fraud caused investors to

suffer loss—*i.e.* loss causation. 544 U.S. at 347. It is **after a corrective disclosure** that a "plaintiff has suffered an economic loss caused by the misstatements because she is no longer able to recoup in the marketplace the inflationary component **of the price she originally paid**." *In re Bofi Holding, Inc. Sec. Litig*, 977 F.3d 781, 789 (9th Cir. 2020) (*citing FindWhat Investor Group v. FindWhat.com,* 658 F.3d 1282, 1311 (11th Cir. 2011). "[L]oss causation does not require a showing 'that a misrepresentation was the *sole* reason for the investment's decline.'" *Id.* (quoting *In re Daou Systems, Inc.*, 411 F.3d 1006, 1025 (9th Cir. 2005)) (emphasis in original). And loss causation can exist even if "the alleged fraud is not necessarily revealed prior to the economic loss." *Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.,* 730 F.3d 1111, 1120 (9th Cir. 2013) ("Disclosure of the fraud is not a sine qua non of loss causation[.]").

In *Dura*, the Supreme Court **fully respected** the PSLRA's requirement of calculating damages based on actual purchase price, and it certainly did not grant lower courts permission to make premature findings of fact regarding "price impact" or "transaction causation", which are separate and distinct elements of reliance (governed by the *Basic* presumption), not loss causation. *See Erica P. John Fund, Inc. v. Halliburton Co.,* 563 U.S. 804, 812-14 (2011) ("*Halliburton I*") (citing *Basic, Inc. v. Levinson*, 485 U.S. 224 (1988)). Rather, when assessing the financial interest of lead plaintiff movants, district courts in this Circuit have routinely found that under *Dura*, the recoverable loss (or retained shares) method, simply "looks to **losses experienced due to the shares that the plaintiff was holding at the time the fraud was disclosed, and thus focuses on losses caused when stock purchased at artificially inflated prices decreases in value due to the disclosure of the fraud**." *In re Lyft Sec. Litig.*, 2020 WL 1043628, at *4 (N.D. Cal. Mar. 4, 2020); *Eichenholtz v. Verifone Holdings, Inc.*, 2008 WL 3925289, at *3-*4 (N.D. Cal. Aug. 22, 2008) (starting point is the "amount paid for the shares retained" as of disclosure date); *see also Xu v. FibroGen, Inc.,* 2021 WL 3861454, at *5 (N.D. Cal. Aug. 30, 2021); *Lewis v. CytoDyn, Inc.*, 2021 WL 3709291, at *5 (W.D. Wash. Aug. 19, 2021), *recons. denied sub nom.*, *Courter v. Cytodyn, Inc.,* 2021 WL 4989446 (W.D. Wash. Oct. 27, 2021); *Scheller v. Nutanix*, 2021 WL 2410832, at *4 (N.D. Cal. June 10, 2021); *In re Fastly, Inc. Sec. Litig.*, 2021 WL 493386, at *3 (N.D. Cal. Feb. 10,

3

2021); *Saint Jermain v. Fluidigm Corp.,* 2020 WL 7342717, at *3 (N.D. Cal. Dec. 14, 2020); *Loftus v. Primero Mining Corp.,* 2016 WL 11741138, at *5 (C.D. Cal. May 12, 2016); *Fialkov v. Celladon Corp.,* 2015 WL 11658717, at *5 (S.D. Cal. Dec. 9, 2015); *Rihn v. Acadia Pharms. Inc.,* 2015 WL 5227923, at *3 (S.D. Cal. Sept. 8, 2015); *Mulligan v. Impax Lab'ys, Inc.,* 2013 WL 3354420, at *5 (N.D. Cal. July 2, 2013); *Schueneman v. Arena Pharm., Inc.,* 2011 WL 3475380, at *4 (S.D. Cal. Aug. 8, 2011); *Perlmutter v. Intuitive Surgical, Inc.*, 2011 WL 566814, at *4 (N.D. Cal. Feb. 15, 2011); *Applestein v. Medivation Inc.,* 2010 WL 3749406, at *2 (N.D. Cal. Sept. 20, 2010); *Ruland v. Infosonics Corp.*, 2006 WL 3746716 (S.D. Cal. Oct. 23, 2006).

The Court justified substituting "just before disclosure price" for "actual purchase price" by improperly making a finding of fact, or at least irrefutably presuming, that the pre-disclosure stock price decline during the Class Period was more likely caused by "market conditions" than by the alleged fraud. This was incorrect because, at the lead plaintiff stage, as at motion to dismiss, the Court must accept the allegations of the complaint as true. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007); *see also In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008) (A "court ruling on a motion to dismiss is not sitting as a trier of fact" and "so long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later stages of the proceedings."). Accordingly, the Court must accept as true that "[a]s a result of [Defendants'] materially false and/or misleading statements and/or failures to disclose, View's securities traded at artificially inflated prices during the Class Period," including "at a Class Period high of $12.91 per share" on January 14, 2021, and thus, the movants, as class members, "purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of View's securities and market information relating to View, and [were] damaged thereby." ¶48. Indeed, during that week, when View's securities were at their peak, Sonthalia bought 22,500 shares. *See* ECF No. 30-2; *see also* Ngo Decl., Ex. 1. It would be inappropriate at this early stage to make even tentative findings of fact as to how much of the movants' purchase price was impacted by the alleged fraud before any fact or expert discovery has been conducted.

As set forth herein, when accepting as true all misstatements and the corrective disclosure,

and correctly applying the PSLRA's damages cap and the *Dura* recoverable loss, this Court should find that Sonthalia has the largest financial interest and is the "most adequate plaintiff." 15 U.S.C. § 78u-4(a)(3)(B). She thus respectfully submits that leave to file a motion for reconsideration of the Court's Lead Plaintiff Order is warranted, as supported by the memorandum of points and authorities submitted herewith, the Declaration of Ivy T. Ngo ("Ngo Decl."), and all exhibits thereto.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. LEAVE TO FILE A MOTION FOR RECONSIDERATION IS WARRANTED

Civil L.R. 7-9(b)(3) provides, in relevant part, that a motion for reconsideration of an interlocutory order is warranted where a court has "fail[ed] to consider material facts or dispositive legal arguments which were presented to the Court before such interlocutory order." *See also School Dist. No. 1J Multnomah Cty., Or. v. ACandS, Inc.,* 5 F.3d 1255, 1263 (9th Cir. 1993) ("Reconsideration is appropriate if the district court…committed clear error…"). Here, Sonthalia and Stadium Capital each moved for appointment as Lead Plaintiff, claiming, *inter alia*, that they possessed the "largest financial interest." (15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(bb)). *See* ECF Nos. 27, 31. Relying on *Dura*, the Court excluded all gains and losses made on Class Period sales by the movants prior to the August 16, 2021 corrective disclosure. To assess the movants' retained shares, the Court then looked to the PSLRA's "limitation on damages" provision (15 U.S.C. § 78u-4(e)).

Sonthalia respectfully submits, however, that the Court erred as a matter of law in applying the PSLRA damages cap to the purchase price of the competing movants' securities and calculating their losses based on of the closing price of View securities directly before the corrective disclosure, rather than their actual purchase price. "[A]doption of a standard in which purchase price never plays a part in determining loss would work a radical change in the law [and] *Dura* requires no such result," *Sallustro v. CannaVest Corp.*, 93 F. Supp. 3d 265, 277 (S.D.N.Y. 2015). "Given the statutory scheme" under which damages are capped, "the difference between the purchase or sale price paid ... by the plaintiff for the subject security and the mean trading price of that security during the 90–day period … **it would be odd to apply a loss model that precludes any reference to purchase price**." *Id*. at 276; *see e.g.*, *Gutman v. Sillerman*, 2015 WL 13791788, at *6 (S.D.N.Y.

NOTICE OF MOTION AND MOTION OF SWETA SONTHALIA FOR LEAVE OF COURT TO FILE MOTION FOR RECONSIDERATION OF ORDER APPOINTING LEAD PLAINTIFF AND APPROVING SELECTION OF COUNSEL (DKT. NO. 67); MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT | CASE NO. 5:21-cv-06374-BLF

Dec. 8, 2015); *Simco v. Aegean Marine Petroleum Network Inc.,* 2018 WL 11226076, at *3 (S.D.N.Y. Oct. 30, 2018); *In re Wrap Techs., Inc. Sec. Exch. Act Litig.*, 2021 WL 71433, at *2 (C.D. Cal. Jan. 7, 2021) (rejecting methodology "which makes purchase price irrelevant").[2]

Dura itself supports the conclusion that excluding the actual purchase price is inappropriate. There, the Supreme Court stated that an "'artificially inflated purchase price' is not itself a relevant economic loss" without a "claim that [the Company's] share price fell significantly after the truth became known." 544 U.S. at 347. This and other language in *Dura* strongly suggests that "the Supreme Court did not rule that purchase price is irrelevant, [t]o the contrary, [it] repeatedly states that purchase price might prove relevant to loss analysis." *Gutman*, 2015 WL 13791788 at *6. Thus, both "the statutory scheme and the [ ] reasoning in *Dura*" preclude a test that "renders purchase price irrelevant." *Simco*, 2018 WL 11226076 at *3. Further, the Court's methodology may lead to unfair or even "absurd" results; "[f]or example, because purchase price is irrelevant [ ], an investor who bought the stock at $100, watched it rise to $150 [just prior to disclosure], then sold the stock at $125 after a corrective disclosure, could recover for the $25 price drop, even though at $125 the investor would have realized a $25 profit." *Sallustro*, 93 F. Supp. 3d at 276 n.11.

Thus, the Court's conclusion that Stadium Capital possessed the largest financial interest, based on an improper application of the PSLRA, constitutes manifest error and meets the standard for reconsideration. *See School Dist. No. 1J*, 5 F.3d at 1263; *Cf. In re Cavanaugh*, 306 F.3d 726, 739 (9th Cir. 2002) (granting writ of mandamus where district court's appointment of a lead plaintiff was inconsistent with the PSLRA); *In re Cohen*, 586 F.3d 703, 710-11 (9th Cir. 2009) (granting writ of mandamus where district court's rejection of lead counsel was inconsistent with the PSLRA).

## A. The Court's methodology erroneously rejected the movants' purchase price.

Traditionally, and before the PSLRA was enacted, courts assessed economic loss in § 10(b)

---

[2] The Court sought to distinguish *Wrap* on the grounds that it "involved multiple partially corrective disclosures [rather than] a single corrective disclosure." 2022 WL 377406, at *8. But *Wrap* rejected the "purchase price irrelevant" method because "both *Dura* and the PSLRA contemplated consideration of the purchase price," not because of multiple disclosures. *Id.* at *2-*3.

6

cases in terms of "out-of-pocket" damages, calculated as the difference between the purchase price and the stock's "true" value. *See Acticon*, 692 F.3d at 39 (quoting *In re Veritas Software Corp. Sec. Litig.*, 496 F.3d 962, 967 n.3 (9th Cir. 2007) and citing S. Rep. No. 104–98, at 20 (1995), reprinted in 1995 U.S.C.C.A.N. 679, 699). A stock's true value was determined by reference to its price at the end of the class period—*i.e.*, "based on the date corrective information is disclosed." *Id*. (quoting S. Rep. No. 104-98, at 20). However, this measure of damages sometimes yielded plaintiffs a windfall if the stock price following a corrective disclosure reflected a market overreaction to negative information and, as such, was not a proper measure of the stock's true price. *Id.* As a result, Congress included a "limitation on damages" in the PSLRA. *See* 15 U.S.C. § 78u-4(e). To assess financial interests here, the Court appropriately looked to the PSLRA's cap on damages, as each movant put forth calculations using the market price of View following the corrective disclosure.

The PSLRA's limitation on damages provides, in relevant part, that where:

> [T]he plaintiff seeks to establish damages by reference to the market price of a security, the award of damages to the plaintiff shall not exceed *the difference between **the purchase or sale price paid or received**, as appropriate, **by the plaintiff for the subject security** and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market.*
> ****
> [I]f the plaintiff sells or repurchases the subject security prior to the expiration of the 90-day period described in paragraph (1), the plaintiff's damages shall not exceed *the difference between **the purchase or sale price paid or received**, as appropriate, **by the plaintiff for the security** and the mean trading price of the security during the period beginning immediately after dissemination of information correcting the misstatement or omission and ending on the date on which the plaintiff sells or repurchases the security.*

15 U.S.C. § 78u-4(e)(1)-(2). Moreover, if securities are sold during the lookback period, legislative history shows that the PSLRA contemplates for damages to be measured using the higher of the actual sale price or the average of the daily closing price from the date of the corrective disclosure to the date of sale. *See Mulligan*, 2013 WL 3354420 at \*5 (quoting *Eichenholtz*, 2008 WL 3925289 at \*2); *see also Schueneman*, 2011 WL 3475380 at \*4; *Applestein*, 2010 WL 3749406 at \*2. Pursuant to 15 U.S.C. § 78c-2(b), "references in the securities laws to the 'purchase' or 'sale' of a security shall be deemed to include the execution, termination (prior to its scheduled maturity date), assignment, exchange, or similar transfer or conveyance of, or extinguishing of rights or obligations

7

under such agreement, contract, or transaction." Thus, by its terms, the statutory damages cap contemplates calculating damages based on a security's actual purchase price. "In its simplest form, a plaintiff's economic loss is the difference between the amount she paid to buy the security (higher than it should have been, in successful 10b-5 cases) and the amount she received when she sold it." *In re Allstate Corp. Sec. Litig.*, 966 F.3d. 595, 604-05 (2020); s*ee, e.g., Dura*, 544 U.S. at 344-45.

The court's analysis in *Schueneman* is instructive. In assessing the financial interest of competing lead plaintiff movants, the court adopted the retained share methodology, "which looks to the number of retained shares at the end of the class period." 2011 WL 3475380 at \*4. Under that methodology, the Court found in applying the PSLRA's damages cap that "**the purchase price of the retained shares** is subtracted from either (1) the average of the daily closing price of the stock during the 90 day period beginning at the end of the class period (if the share was not sold during the 90 day period) or (2) the higher of the actual sale price or an average of the daily closing price from the end of the class period to the date of sale (if a share was sold within the 90 day period)." *Id.* (quoting *Eichenholtz*, 2008 WL 3925289 at \*4). Next, the court determined that, "[t]he purchase price is calculated based either on the purchase price of shares purchased at the beginning of the class period [("First-In-First-Out ("FIFO"))] or the purchase price of shares purchased most recently, but within the class period [(Last-In-First-Out ("LIFO"))]." *Id.* The lead plaintiff movant in *Schueneman*, represented by Stadium Capital's counsel, Kaplan Fox, utilized the PSLRA's damages cap in estimating the losses of competing movants' retained shares. *See Schueneman*, ECF No. 49 at 1-2. Given that Stadium Capital's counsel correctly applied the PSLRA damages cap in *Schueneman*, it is surprising that they have taken a contrary position in this Action by arguing that the PSLRA does not use the actual purchase price when calculating damages.

In light of the clear guidance from Congress, the Supreme Court, and the Ninth and Seventh Circuits, the Court erred as a matter of law in its application of the PSLRA's damages cap. The Court, in seeking to follow the statutory damages cap, (i) multiplied the number of View shares held by Sonthalia throughout the Class Period and lookback period, by the difference between the closing price of View securities on the last day of the Class Period and the lookback price; and (ii) multiplied

8

the number of View shares held by Stadium Capital at the end of the Class Period, but sold within the lookback period, by the difference between the closing price of View securities on the last day of the Class Period and Stadium Capital's actual sale price. By failing to utilize the movants' actual purchase price, the Court did not properly apply the first component of the PSLRA's damages cap.

Moreover, utilizing the movants' actual purchase price, as prescribed in the PSLRA damages cap, is consistent with the theory of fraud alleged in the Complaint (which must be accepted as true). The Complaint alleges that "[a]s a result of [Defendants'] materially false and/or misleading statements and/or failures to disclose, View's securities traded at artificially inflated prices during the Class Period" which reached "a Class Period high of $12.91 per share" on January 14, 2021, and that "members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of View's securities and market information relating to View, and have been damaged thereby." ¶48. Notably, during that week when View's securities were at their peak, Sonthalia purchased 22,500 shares. *See* ECF No. 30-2; *see also* Ngo Decl., Ex. 1. Accordingly, per the Complaint, Sonthalia and Stadium Capital purchased View securities at artificially inflated prices as a result of the alleged misstatements and omissions and incurred losses after the "information correcting the misstatement or omission that is the basis for the action [wa]s disseminated to the market" on August 16, 2021. 15 U.S.C. § 78u-4(e)(1)-(2). Applying the statutory damages cap to the "artificially inflated prices" at which Class members purchased View securities in the novel way the Court did disregards the Complaint's allegations to the detriment of the Class, particularly the recoverable losses of Class members, like Sonthalia, who purchased their securities early in the Class Period – closer in time to the alleged misstatements. *See* Ngo Decl., Ex. 1.

**B.** **The Court's interpretation of *Dura* conflates loss causation with transaction causation, making an improper finding of fact at the lead plaintiff stage.**

To recover damages under § 10(b) and Rule 10b-5, a plaintiff must prove: (1) a material misrepresentation (or omission); (2) scienter, *i.e.*, a wrongful state of mind; (3) connected with the purchase or sale of a security; (4) reliance, often referred to as "transaction causation" in cases involving public securities markets (fraud-on-the-market cases); (5) economic loss; and (6) "loss causation," *i.e.*, a causal connection between the misrepresentation and the loss. *Halliburton I*, 563

U.S. at 804. The last three elements are intertwined legally, conceptually, and factually, but the Supreme Court has instructed that they be considered at different stages of the case. *Allstate*, 966 F.3d at 605. To certify a class under Rule 23(b)(3), a plaintiff must show the ability to use common evidence of reliance, *i.e.,* the *Basic* presumption. *Basic*, 485 U.S. at 248. Loss causation, on the other hand, must be entirely reserved for the merits. *Halliburton I*, 563 U.S. at 804.

Loss causation requires a plaintiff to "demonstrate that the defendant's deceptive conduct caused their claimed economic loss." *Id*. at 807. The Supreme Court in *Halliburton I* distinguished loss causation from the related yet separate concept of "transaction causation" that it had long held is synonymous with reliance. *See id*. at 812, citing *Dura*, 544 U.S. at 341-42, citing in turn *Basic*, 485 U.S. at 248-49. The latter is *Basic*'s "fundamental premise—that an investor presumptively relies on a misrepresentation so long as it was reflected in the market price **at the time of [the] transaction**" —which is distinct from "[t]he fact that a subsequent loss may have been caused by factors other than the revelation of a misrepresentation" and bears "no logical connection to the facts necessary to establish the efficient market predicate to the fraud-on-the-market theory." *Id.* at 813.

As explained by the Eleventh Circuit and adopted by the Seventh Circuit:

> Just as an efficient market translates all available ***truthful*** information into the stock price, the market processes the publicly disseminated ***falsehood*** and prices it into the stock as well. *See* [*Basic*, 485 U.S.] at 241-42. The market price of the stock will then include an artificial "inflationary" value—the amount that the market mistakenly attributes to the stock based on the fraudulent misinformation. So long as the falsehood remains uncorrected, it will continue to taint the total mix of available public information, and the market will continue to attribute the artificial inflation to the stock, day after day. If and when the misinformation is … corrected by the release of truthful information, *i.e.,* a corrective disclosure, the market will recalibrate the stock price to account for this change in information, eliminating whatever artificial value it had attributed to the price. That is, the inflation within the stock price will "dissipate."

*FindWhat*, 658 F.3d at 1310; *see e.g.*, *Allstate*, 966 F.3d at 612. Price impact boils down to whether an alleged misrepresentation "actually affected the market price" of the security. *Id.* Circuit courts have observed that a direct approach to price impact is difficult "because it requires knowing a counterfactual: what the price would have been without the false statement." *Glickenhaus & Co. v. Household Intern., Inc.,* 787 F.3d 408, 415 (7th Cir. 2015). "The stock price may even decline after a false statement, but be inflated nonetheless 'because the price might have fallen even more' if the

10

full extent of the bad news were known." *Allstate*, 966 F.3d at 612.

The Ninth Circuit in *Dura* had held that to plead loss causation, plaintiffs need only allege that the share price was inflated when they purchased stock. *Broudo v. Dura Pharms., Inc.*, 339 F.3d 933, 941 (9th Cir. 2003), *rev'd*, 544 U.S. 336 (2005). The Supreme Court disagreed, drawing a distinction between economic losses and recoverable damages, and explained that an inflated purchase price due to deception or misstatement does not in and of itself constitute or proximately cause the relevant economic loss. *Dura*, 544 U.S. at 347. At the time plaintiffs purchase a security, they have suffered no loss because the inflated purchase payment is offset by ownership of a share that at that instant possesses equivalent value. *See id*. at 343. If plaintiffs sell their stock prior to a corrective disclosure, while it was still artificially inflated, there would be no recoverable loss attributable to the alleged fraud. *Id.* Insomuch, plaintiffs must also provide "defendants with notice of what the relevant economic loss might be or of what the causal connection might be between that loss and the misrepresentation alleged"—*i.e.*, the claimed economic loss was the result of a truth revealed. *Id.* at 347. As such, at the pleading stage, loss causation is typically satisfied by allegations that a defendant revealed the truth through "corrective disclosures" which "caused the company's stock price to drop and investors to lose money." *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2406 (2014); *see e.g.*, *Irving Firemens Relief and Ret. Fund v. Uber Techs. Inc.*, 998 F.3d 397, 407 (9th Cir. 2021); *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 425-26 (3d Cir. 2007).

To establish loss causation under a "fraud-on-the-market" theory, a "plaintiff must show that after purchasing her shares and before selling, the following occurred: (1) 'the truth became known,' and (2) the revelation caused the fraud-induced inflation in the stock's price to be reduced or eliminated." *Irving Firemens*, 998 F3d at 407; *e.g., BofI Holding*, 977 F.3d at 789; *Dura*, 544 U.S. at 347. This analysis involves a temporal element in that "a disclosure followed by an immediate drop in stock price is more likely to have caused the decline." *BofI Holding*, 977 F.3d at 790. For example, the Ninth Circuit has held loss causation adequately alleged where plaintiffs claimed that a company engaged in improper accounting practices and the "stock [price] fell precipitously after [the company] began to reveal figures showing the company's true financial condition." *Daou*, 411

11

F.3d at 1026. However, the Ninth Circuit has rejected "a bright-line rule requiring an immediate market reaction because the market is subject to distortions that prevent the ideal of a free and open public market from occurring." *Gilead*, 536 F.3d at 1057-58. Pleading loss causation "should not prove burdensome," *id*., for even under Rule 9(b), a plaintiff need only give a defendant "notice of plaintiffs' loss causation theory" and provide the court "some assurance that the theory has a basis in fact." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 989-90 (9th Cir. 2008). Thus, at the pleading stage, courts simply require plaintiffs to allege the stock price was impacted following a corrective disclosure—not to negate a decline in the stock price prior to the corrective disclosure.

Here, the Court chose to apply *Dura* and correctly did so by excluding Stadium Capital's Class Period **sales** prior to the August 16, 2021 corrective disclosure, because those sale prices were also artificially inflated by the alleged fraud. However, the Court incorrectly interpreted *Dura* as providing it discretion to assess at the lead plaintiff stage, whether the alleged impact on the stock price due to Defendants' misstatements can be causally connected to the truth revealed—leading it to hold that since the market price at which the movants bought their retained shares was higher than the market price just before the corrective disclosure, this decrease in value "is likely not linked to the alleged fraud." ECF No. 67, at 10-11. But Sonthalia did not sell any of her shares during the Class Period or lookback period, so no analysis under *Dura* changes her recoverable loss.

In sum, neither the Supreme Court in *Dura* nor any circuit court considering *Dura* has required a plaintiff, at the pleading stage, to prove price impact with regard to loss causation or transaction causation. The Court should not make this determination in calculating financial interest at the even earlier lead plaintiff stage. *See*, e.g., *Cook v. Allergan PLC*, 2019 WL 1510894, at \*3 (S.D.N.Y. Mar. 21, 2019) (courts "cannot simply guess about the effect of ... as yet-unknown factors in selecting a lead plaintiff"); *In re Watchguard Sec. Litig.*, 2005 U.S. Dist. LEXIS 40923 (D. Wash. July 13, 2005) (a court "must rely solely on the pleadings and declarations that each contestant provides" in determining which movant to select as lead plaintiff); *Perlmutter*, 2011 WL 566814, at \*5 (since "calculating damages in a securities fraud case is a highly technical task that usually involves a battle of experts" and a lead plaintiff is selected "at a very early stage of litigation, before

12

fact discovery and often long before the plaintiff's theory of the case is fully developed," courts "prefer to choose a lead plaintiff based on total losses – a rough estimate for a plaintiff's maximum recoverable damages – rather than attempting to estimate a plaintiff's recoverable losses").

### C. Pursuant to the PSLRA and *Dura,* Sonthalia has the largest financial interest.

As set forth in Sonthalia's Motion and supporting documents, she has the largest financial interest in the Action when applying the Court's methodology, while utilizing the actual purchase price as laid out in the PSLRA. The Court correctly determined the number of retained shares for each movant. However, the Court must then calculate the movants' damages using the difference between their retained shares' actual purchase price and (i) for Sonthalia, the mean trading price of View stock during the lookback period; and (ii) for Stadium Capital, the higher of its actual sale price and the mean trading price of View stock during the period beginning after the corrective disclosure and ending on the day it sold its retained shares during the lookback period.

Sonthalia bought 60,424 shares of View stock, expending $700,202 between December 10, 2020 and February 5, 2021, and retained them throughout the Class Period and the lookback period. *See* ECF No. 27 at 5-6; No. 30, Ex. B; No. 61, Ex. A. Accordingly, her damages are calculated as the difference between the price paid ($700,202) and the lookback price ($316,017 = 60,424 x $5.23), totaling $384,185. *Id*. Stadium Capital bought 426,235 shares of View stock, expending $3,642,869 between December 1, 2020 and August 12, 2021. *See* ECF No. 31 at 4-5; ECF No. 31-1, Ex. 3. It retained 60,000 shares at the end of the Class Period, at a net expenditure of $380,884[3], and sold those shares on August 17, 2021 for $4.2306 after the corrective disclosure. *See* ECF No. 61, Ex. A; No. 31-1, Ex. 3. As a result, its damages are calculated as the difference between the price paid ($380,884) and the price sold ($253,836 = 60,000 x $4.2306), totaling $127,048. *Id*.

Accordingly, Sonthalia is the presumptive most adequate plaintiff. And since no movant has contended that she would not satisfy Rule 23's requirements, she should be appointed Lead Plaintiff.

---

[3] Stadium Capital's actual purchase price is the same under FIFO or LIFO. It sold all prior Class Period shares by July 19, 2021, on which date it had no shares, so its "retained" 60,000 shares must be traced to its purchases between July 19, 2021 and August 12, 2021. *See* ECF No. 48, at 3-4.

## II. CONCLUSION

For the foregoing reasons, Sonthalia respectfully requests that the Court vacate its Lead Plaintiff Order, appoint her as Lead Plaintiff, and approve Roche Freedman LLP as Lead Counsel.

DATED: February 22, 2022

Respectfully Submitted,

**ROCHE FREEDMAN LLP**

*/s/ Ivy T. Ngo*

Ivy T. Ngo (249860)
Constantine P. Economides (*pro hac vice* forthcoming)
Velvel (Devin) Freedman (*pro hac vice* forthcoming)
1 SE 3rd Avenue, Suite 1240
Miami, Florida 33131
T: (305) 971-5943
ingo@rochefreedman.com
ceconomides@rochefreedman.com
vel@rochefreedman.com

*Counsel for Sweta Sonthalia and Proposed Lead Counsel*

**LABATON SUCHAROW LLP**
David J. Schwartz (*pro hac vice* forthcoming)
140 Broadway
New York, New York 10005
T: (212) 907-0870
dschwartz@labaton.com

*Additional Counsel for Sweta Sonthalia*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on February 22, 2022, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such filing to counsel of record.

By:     /s/ Ivy T. Ngo
          Ivy T. Ngo

15